# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

BERTRAM COMMUNICATIONS LLC,

                Appellant,

    v.                                        Case No. 09-CV-1037

NETWURX, INC.,

                Appellee.

_____

## ORDER

On November 4, 2009, Bertram Communications, LLC ("Bertram"), pursuant to 28 U.S.C. § 158(a), appealed two decisions made by the United States Bankruptcy Court for the Eastern District of Wisconsin ("bankruptcy court") in case number 08-26131, *In re: Netwurx, Inc.* (Docket #1). Three months later, on February 18, 2010, this court dismissed one of the issues on appeal, whether the bankruptcy court "erred in confirming the Chapter 11 Plan of Reorganization" proposed by the appellee, Netwurx, Inc. ("Netwurx"). (Docket #24). The only issue remaining for this court to examine is "whether the Bankruptcy Court erred in disallowing Bertram Communications, LLC's request for an administrative claim for post-petition services rendered." (Appellant's Br. 1). With the benefit of the parties' briefs, the court addresses the remaining issue on appeal. The court begins by providing the factual background that precipitated the dispute with respect to the remaining issue on appeal.

## BACKGROUND

Netwurx is an internet service provider ("ISP") located in southeastern Wisconsin, "providing telecommunications services to end users." (Appellant's Br. 2). Bertram is a wireless internet provider, who, as a wholesaler, sells the ability to connect to the internet to retailers, such as Netwurx. Starting in 2007 and ending in the summer of 2008, Bertram sold to Netwurx connection space, which the appellee, in turn, sold to its retail customers. In the midst of the period when Bertram was providing telecommunication services to Netwurx, on June 5, 2008, the appellee filed a voluntary petition for Chapter 11 reorganization. On July 1, 2008, James Bertram, the appellant's president and owner, filed a letter directed to the bankruptcy court "informing" the court that Netwurx owed Bertram Communications for service fees and late fees totaling $54,089.16 related to the appellant providing Netwurx with internet service during May, June and July of 2008. Several months later, on October 30, 2008, Bertram filed an administrative expense claim for post-petition services, totaling $18,844.75, which the debtor objected to on November 11, 2008.

On January 30, 2009, the bankruptcy court conducted an evidentiary hearing on the claim objections to determine the factual basis for Bertram's administrative claim. First, the appellant's chief financial officer, Gina Bertram, testified. Ms. Bertram stated that Bertram's relationship with Netwurx began in February of 2007, and Netwurx "stopped paying" in April of 2008. (Tr. 14:15-16).[1] The witness further

---

[1] All citations to a transcript in this order are to the transcript of the January 30, 2009 hearing.

Case 2:09-cv-01037-JPS Filed 07/29/10 Page 2 of 22 Document 30
Case 08-26131-svk Doc 383 Filed 08/02/10 Page 2 of 22

noted that Netwurx never executed a written contract for the services that Bertram provided to the appellee. (Tr. 25:10; 27:20-22). Perhaps most importantly, Ms. Bertram testified with regard to a May 30, 2008 meeting that the appellant's representatives had with Peter Maher ("Maher"), the chief executive officer of Netwurx. The witness stated that at the meeting the parties talked about selling Netwurx to Bertram. (Tr. 29:3-4). Moreover, Ms. Bertram testified that she was unsure if Mr. Maher "told us that he wasn't going to pay . . . [for] the services."[2] (Tr. 29: 5-8). Ms. Bertram further disclosed that the appellant "continued the service" after that meeting as Bertram was "trying to work with [Mr. Maher] to see if . . . [it] was an option for [the appellant] to buy the customer base." (Tr. 29:5-15). The witness noted that it was within the appellant's abilities to "turn off" service. (Tr. 31:2; 32:6). Additionally, Ms. Bertram testified that the decision was made to continue service to Netwurx after it filed for bankruptcy, in part, because they relied on a statement[3] by Mr. Maher that "you couldn't shut customers off after [the company was] in Chapter 11."[4] (Tr. 31: 22-23). The witness then concluded her testimony by stating that Mr. Maher's statement prompted her to inquire into the legal validity of Mr. Maher's claim, and once the appellant "found out it was okay" to shut

_____

[2] Ms. Bertram further testified "I don't think he said that he was not going to pay us at all, because he was discussing selling his business." (Tr. 29:16-18).

[3] Its unclear from Ms. Bertram's testimony when exactly Mr. Maher made this statement.

[4] Ms. Bertram further testified later in the hearing that "he said that post-bankruptcy you . . . are not allowed to shut off our customers." (Tr. 37:9-10).

-3-

off Netwurx's services, Bertram "shut the customers off" on the second or third of July in 2008. (Tr. 37: 18-23).

After Ms. Bertram concluded her testimony at the January 30, 2009 hearing, James Bertram was called to the stand. The witness testified that he did not "recall hearing" Mr. Maher tell him "straight out that he was not going to pay [the] company for any more services provided to Netwurx" at the meeting in late May of 2008. (Tr. 50:11-14). Mr. Bertram further stated that after Netwurx filed for bankruptcy, Mr. Maher stated "I don't believe you can shut my customers off because its an estate." (Tr. 41:7-8). The witness further testified that he "didn't know" what Mr. Maher's statement meant, but "didn't want to do something wrong" and "have ramifications back." (Tr. 41:8; 10-11). Notably, the witness knew that Mr. Maher was not an attorney. (Tr. 49:15) Mr. Bertram then testified that he did some "research" on his own, which, in the words of the bankruptcy court, led him to "believe [he] couldn't shut [Netwurx] off." (Tr. 41:15-16; 42:22-24, 51:21-24).

Peter Maher next testified at the January 30, 2009 hearing. Mr. Maher unequivocally stated that the debtor received the benefit of the services provided by Bertram both "pre and post petition." (Tr. 54:2-6). The witness further testified that he told Bertram, before the appellee filed for bankruptcy, that "they would have to make a decision whether they would like to continue to provide services, but [that Netwurx] would no longer pay them ever again." (Tr. 54:14-17). In fact, Mr. Maher emphatically repeated his comments throughout his testimony, stating that he

-4-

"absolutely told" Bertram that, during the meeting on May 30, 2008, Netwurx would no longer pay them (Tr. 55:9), with his "exact" words being "I will no longer pay you ever again."[5] (Tr. 55:25 - 56:1). The witness also testified that, after Netwurx had filed for Chapter 11 reorganization, he told Mr. Bertram that "I don't believe [you] can shut [Netwurx's customers] off." (Tr. 65:17-18). Mr. Maher admitted that he "was not clear of the law." (Tr. 65:16). David Roller, the director of operations for Netwurx, also testified with regard to the meeting that occurred on May 30, 2008, between the two company's officials, confirming Mr. Maher's testimony. (Tr. 110:14).

The court took the testimony under advisement, and, on February 27, 2009, the bankruptcy court issued a decision and order first finding that Bertram's claim for post-petition services could not be allowed as an administrative claim because the inducement occurred pre-petition. (*Decision and Order on the Debtor's Objection to the Claims of Bertram Communication, LLC,* Case No. 08-26131-SVK, Docket #96 ("Decision") 4). Second, the bankruptcy court stated that Bertram's post-petition expenses of $18,844.75 could not be allowed as a general unsecured claim, as the court found that Bertram could not succeed under a theory of unjust enrichment or *quantum meruit.* (Decision 4-5). Third, the court found that Bertram was entitled to a general unsecured claim in the amount of $26,020.94 for pre-petition services. (Decision 6-7). On November 11, 2009, Bertram filed a notice of appeal, arguing,

---

[5] The relationship between Bertram and Netwurx was quite rocky. Mr. Maher explained during his testimony that he told Bertram that he no longer intended to pay the company because of "price increases, the lack of services, [and] the taking over of" a tower by Bertram. (Tr. 57:1-2).

in relevant part, that the bankruptcy court erred by: (1) disallowing Bertram's request for an administrative claim for post-petition services rendered; and (2) disallowing Bertram's request for post-petition expenses to be treated as a general unsecured claim under a theory of unjust enrichment or *quantum meruit*. (Docket #1). The court proceeds to examine the legal efficacy of the appellant's claim.

## DISCUSSION

This court has jurisdiction to hear an appeal of a bankruptcy court's order under 28 U.S.C. § 158(a). As the reviewing court, the district court must "apply a clear error standard to the bankruptcy court's factual findings and review its resolutions of legal questions *de novo.*" *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). A finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Smith*, 582 F.3d 767, 777 (7th Cir. 2009) (internal citations omitted).

Bertram's principal issue on appeal is that the bankruptcy court erred by disallowing Bertram's request for an administrative claim for post-petition services rendered. Section 503 of the Bankruptcy Code provides priority status for the payment of "actual, necessary costs and expenses of preserving the [bankruptcy] estate," including "wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). The logic of the Bankruptcy Code in giving priority to parties who supply goods or services to a debtor-in-

possession is to encourage such parties to do business with the bankruptcy estate. *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984). However, "administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources that will be equally distributed to creditors." *In re Nat'l Steel Corp.,* 316 B.R. 287, 299 (Bankr. N.D. Ill 2004). The Seventh Circuit has adopted a strict two-part test for determining whether a particular debt will be afforded administrative priority: (1) the debt must arise from a transaction with the debtor-in-possession; and (2) the debt must be beneficial to the debtor-in-possession in the operation of the business. *Jartran*, 732 F.2d at 586-87 (citing *In re Mammoth Mart*, 536 F.2d 950, 954 (1st Cir. 1976)). To satisfy the first prong of the *Jartran* test, the creditor must enter into a transaction with the post-petition debtor or the debtor must have induced the creditor's performance. *Jartran*, 732 F.2d at 588. The debt may not merely arise out of commitments made before the debtor-in-possession came into existence. *Id.* "[W]hen third parties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, the purposes of [administrative claims] plainly require that their claims be afforded priority." *Mammoth Mart*, 536 F.2d at 954 (noting that the debtor-in-possession is "free to . . . reject burdensome executory contracts."). The second prong of the *Jartran* test requires an actual and necessary benefit to the bankruptcy estate. *Id.* at 587. The moving party bears the burden of showing its claim is entitled to administrative expense priority, and the standard of

proof is preponderance of the evidence. *In re FBI Distrib. Corp.*, 330 F.3d 36, 42 (1st Cir. 2003).

Applying this standard of proof, the bankruptcy court found that Bertram could demonstrate that it met the second prong of the *Jartran* test, as the appellant had conveyed a benefit to Netwurx by continuing to provide the debtor with telecommunication service after the appellee filed for bankruptcy on June 5, 2008. (Decision 3) ("Here, Netwurx cannot reasonably dispute that Netwurx received a benefit from Bertram's services."). However, the bankruptcy court also found that Bertram could not prove that it was entitled to an administrative claim under the first prong of the *Jartran* test because "although Netwurx may have received valued based Bertram's post-petition services," "Bertram's agreement with Netwurx to provide internet services occurred pre-petition" and was rejected before Netwurx became a debtor-in-possession.[6] (Decision 3).

On appeal, Bertram makes several arguments that the bankruptcy court's findings that there were no post-petition inducements was clearly erroneous. (Appellant's Br. 5) ("However, the Court does not give proper weight to the testimony that indicates there were in fact post-petition inducements."). First, the appellant argues that the bankruptcy court discounted evidence that on May 30, 2008, "Mr. Maher talked to the Bertrams about possibly selling the Netwurx customers to Bertram." (Appellant's Br. 5). The appellant contends that Mr. Maher's statement

---

[6] In concluding as such, the bankruptcy court noted that "before the bankruptcy, Netwurx told Bertram it would not pay for the services anymore."

induced the Bertrams to "continue service in order to preserve the customers pending a sale, as without these services the customers would be lost." (Appellant's Br. 5).

The court is unpersuaded by the appellant's first argument. There is a dearth of evidence in the record indicating that there was a formal arrangement to have Bertram purchase Netwurx's customers in exchange for continuing internet service post-petition. The closest the testimony of any party comes to discussing any sort of arrangement is the testimony of Ms. Bertram, who stated that the two parties were exploring the "option" of having the appellant purchase the appellee's clients. (Tr. 29:5-15). The bankruptcy court did not error by finding that Ms. Bertram's testimony failed to show that Mr. Maher induced the appellants into continuing services post-petition. The bankruptcy court found Mr. Maher's testimony that he emphatically stated that he would "no longer pay [Bertram] ever again" (Tr. 55:25 - 56:1), credible and concluded that Bertram could not be induced by discussions regarding the possible purchase of the appellee's customers when there was zero possibility that continuing the services would result in payment. While Mr. Bertram and Ms. Bertram testified that they did not recall Mr. Maher making such a statement, this court is unable to conclude that the bankruptcy court was clearly erroneous in accepting the testimony of Mr. Maher and rejecting the testimony of the Bertrams. *See Anderson v. Bessemer City*, 470 U.S. 564 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Case 2:09-cv-01037-JPS Filed 07/29/10 Page 9 of 22 Document 30
Case 08-26131-svk Doc 383 Filed 08/02/10 Page 9 of 22

Perhaps more importantly, even if the court does find that there was some sort of statement about selling customers to Bertram by Mr. Maher that compelled the appellant to continue to provide Netwurx telecommunication services, such a statement does not constitute *post*-petition inducement, as the conversation in question occurred *before* Netwurx filed for bankruptcy. Bertram argues that the "possibility of a sale remained past the petition filing date, and so the pre-petition inducement continued on as a post-petition inducement." (Appellant's Br. 5). However, "inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority." *Jartran,* 732 F.2d at 587 (emphasis in original). The appellant cites to no authority indicating that pre-petition inducement can "continue on" as post-petition inducement,[7] and, as such, the court is obliged to reject Bertram's first argument for reversal.

Second, Bertram argues that the bankruptcy court erred by failing to find that "Mr. Maher . . . induced the Bertrams post-petition when he stated to Mr. and Mrs. Bertram that because he was in Chapter 11, they could not shut off service." (Appellant's Br. 5). When applying the first prong of the *Jartran* test that "the debt must arise from a transaction with the debtor-in-possession," 732 F.2d at 588, it

---

[7] In fact, if any statement made before a petition for bankruptcy is filed can "continue on" to influence a creditor such that they provide services post-petition, the distinction between pre- and post-petition inducement is obliterated. The goal of providing priority to administrative claims is to encourage parties to contract with the debtor-in-possession. If the court reads the first prong of the *Jartran* test to encompass pre-petition statements, the value of the intended priority envisioned by Congress would be "diluted." *Jartran,* 732 F.2d at 586. Moreover, the court notes that the appellants do not argue that Netwurx "had a duty to take affirmative steps to prevent [Bertram] from engaging in post-petition performance," and, as such, any silence by Netwurx is meaningless. *Id.* at 587.

Case 2:09-cv-01037-JPS Filed 07/29/10 Page 10 of 22 Document 30
Case 08-26131-svk Doc 383 Filed 08/02/10 Page 10 of 22

appears at first blush that Bertram's argument is wholly without merit, as the post-petition assertion by Mr. Maher, if believed, did not constitute some sort of agreement or transaction between the parties. However, *Jartran* also noted that the first prong of the test for whether a claim is entitled to the benefit of administrative priority can be also be met by a showing of "inducement of the creditor's performance by the debtor-in-possession." *Id.* There is a lack of case law explaining what "inducement" in the context of the first prong of the *Jartran* test exactly entails, 732 F.2d at 591 ("We leave to another day the problem of what sort of post-petition conduct by the debtor could lead to a conclusion . . . that the claimant was thus entitled to administrative priority"), and neither party cites to any authority that is particularly helpful. The cases that have found that a debtor "induced" a creditor's performance have done so in a context where the debtor unequivocally assured and urged the creditor that an agreement forged pre-petition would continue. *See, e.g., In re Pre-Press Graphics Co.*, 287 B.R. 726, 731 (Bankr. N.D. Ill. 2003) ("By assuring Nolte that the Agreements would be "going forward" and continuing to accept Nolte's services and the benefits flowing therefrom, the Debtor induced Nolte's performance"); *see also In re Collins & Aikman Corp.*, 384 B.R. 751, 760 (Bankr. E.D. Mich. 2008) (holding that a detailed email sent by the debtor, a tool manufacturer, to a creditor tool supplier constituted inducement under the Sixth Circuit's equivalent to the *Jartran* test, as the email both (1) was intended to induce the creditor's performance and (2) resulted in the continued performance); *In re*

*Carpet Ctr. Leasing Co.*, 991 F.2d 682, 686-687 (11th Cir. 1993) ("Debtor actively sought to retain possession of the tractors by agreeing to pay Paccar monthly adequate protection payments . . . [t]he negotiation for continued possession of the tractors in return for adequate protection is a post-petition transaction providing new value to the bankruptcy estate.") The court is also guided by a 2003 opinion by Judge Gerber of the United States Bankruptcy Court for the Southern District of New York:

> "The 'inducement' requirement . . . must be construed with common sense – to filter out, as in *Jartran*, claims for administrative expense treatment where the post-petition benefit is requested pre-petition and/or unwanted by the post-petition debtor-in possession, but to require administrative expense treatment where the post-petition benefit is knowingly accepted and desired, post-petition, by the post-petition debtor-in-possession."

*In re Adelphia Bus. Solutions, Inc.*, 296 B.R. 656, 665 (Bankr. S.D.N.Y. 2003).

Applying these principles to the specific issue at hand, the court concludes that Mr. Maher's statement to Mr. Bertram that, "I don't believe you can shut my customers off because its an estate" (Tr. 41:7-8), does not constitute "inducement" under the first prong of the *Jartran* test. First, there was nothing unequivocal about Mr. Maher's statement that exhibited a knowing acceptance or desire of the benefit Bertram was providing to Netwurx. Notably, Mr. Maher had, prior to uttering the statement in question, told Bertram that Netwurx would no longer pay the appellant "ever again" for the services it was rendering under the contract. The court does not find error in the bankruptcy court concluding that the rather lukewarm statement "I

-12-

don't believe you can shut my customers off," when viewed in the context of earlier statements outright rejecting the contract in question, failed to reasonably induce the Bertrams into continuing to provide telecommunication services.[8]   Moreover, the testimony of Mr. Bertram and Mr. Maher all indicate that Maher was providing a rather hesitant[9] opinion on the state of the law, rather than expressing some sort of desire to continue the business relationship.   Additionally, as the bankruptcy court noted, there was significant evidence in the record that the true catalyst for Bertram continuing to provide telecommunication services to the debtor was the appellant's hope to purchase those customers from Netwurx and not Mr. Maher's statements about the legal perils of shutting off Netwurx's customers.[10]   Bertram took the calculated risk that by continuing to provide service to Netwurx's customers after the appellee's petition was filed that Bertram could avoid upsetting potential future customers even knowing that Netwurx refused to pay for such services.   While Bertram's gamble did not pay off, as the company was unsuccessful in acquiring Netwurx's customers, merely providing a benefit post-petition to the debtor does not, in and of itself, transform a debt into an administrative priority claim.   *Jartran,* 732

---

[8] This is particularly true given that Mr. Maher was not a lawyer and the Bertrams, business people of over thirty years (Tr. 47:9), knew that Mr. Maher's take on the law was lacking any basis.

[9] Mr. Bertram testified that Mr. Maher used the phrase "I don't believe you can." (Tr. 41:7-8).

[10] There is also evidence in the record that Mr. Bertram was persuaded to continue providing telecommunication services, not because of Mr. Maher's statement, but because of Mr. Bertram's *own* research he did on the internet regarding bankruptcy law. (Tr. 41:15-16; 42:22-24, 51:21-24).

-13-

F.2d at 586-87. In fact, Bertram was so unpersuaded by Mr. Maher's assertions about the law that Mr. Bertram did outside research on bankruptcy law to determine whether he could shut off Netwurx's customers[11] and the company, belatedly, consulted an attorney to determine whether the appellant could shut off services.[12] In short, the court finds the bankruptcy court did not clearly error by finding that inducement did not occur in this case. The only way inducement could exist in this case is if the first element of the *Jartran* test was given a very expansive meaning to encompass off-handed comments by the agents of a debtor-in-possession that had the remote and patently unreasonable[13] possibility of causing the creditor to continue to provide services to the debtor. Given that administrative priority claims are to be strictly construed, *In re Federated Dep't Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir.2001), the court finds it improper to expand the "inducement" requirement

---

[11] Mr. Bertram conceded in his testimony that his own research was a reason why he continued to provide services to Netwurx. (Tr. 41:15-16; 42:22-24, 51:21-24).

[12] The court surmises that Bertram did this only after they concluded that they no longer had the opportunity to acquire Netwurx's customers.

[13] The court finds that it borders on the absurd that Bertram could reasonably rely or be induced by the assertion of a non-lawyer regarding the law.

as such.[14]  *See also In re Larsen*, 80 B.R. 784, 788 (Bankr. E.D. Va. 1987) ("It is not

enough that the debtor-in-possession take some action that gives rise to a claim: a

transaction *between* the creditor and debtor-in-possession must occur") (emphasis

in original).

Third, Bertram attempts to distinguish *Jartran,* arguing that, unlike in *Jartran*,

here, the debtor "continued to take and sell the service offered" by the creditor and

"continued to make money from this service post-petition." (Appellant's Br. 6).

However, in *Jartran*, like in this case, the debtor did indeed benefit from the

continued services of the creditor.  732 F.3d at 587 ("There is no question that the

appearance of ads in Yellow Page directories throughout the country is beneficial to

Jartran, as a debtor-in-possession, in the operation of its business . . . [a]fter filing

the petition in bankruptcy, Jartran *continued to place new ads* in directories

throughout the nation, thus evidencing the importance of Yellow Pages advertising

to the success of the Jartran business.")  The issue in *Jartran* is identical to the issue

in this instant case: whether there was any post-petition transaction or inducement

---

[14] The appellant, later in its brief, argues, without citation, that the "Debtor's arguments with regards to the administrative claim in effect state that a debtor can demand that a creditor continue to provide a service because the debtor is in bankruptcy, can make a profit from the service when the creditor complies with these demands, and the debtor never has to pay the creditor anything for it . . . [t]his is an absurd result." (Appellant's Br. 7).  The appellant is being disingenuous.  First, there is nothing in the record that indicates that the debtor "demanded" that the creditor continue to provide their service; the debtor, at best, made an off-hand comment about the legal ability for the creditor to cut-off services.  As discussed above, the unequivocal statements by Mr. Maher that he would no longer pay for services removes any chance that the statements in question were any sort of "demand."  Moreover, just because a creditor's claim is not given administrative status does not mean that the debtor "never has to pay the creditor anything for it;" the claim is merely given lower priority.  11 U.S.C. § 507.

-15-

by the debtor-in-possession resulting in the creditor conveying a benefit on the debtor. The Seventh Circuit concluded in *Jartran* that there was no transaction or inducement by the debtor-in-possession; faced with nearly identical material facts in this case, this court is obliged to conclude similarly.

Bertram cites the case of *In re Home Interiors & Gifts, Inc.,* No. 08-31961-11-BJH**,** 2008 Bankr. LEXIS 2476 (Bankr. N.D. Tex. Oct. 9, 2008) in support of its attempt to distinguish *Jartran.* The court is puzzled by the appellant's citation, as even a cursory reading of the case indicates to the reader that the court in that case limited its holding to the specific context of the continued use of a creditor's *trademark*.[15] *Id.* at *14; 21 ("However, HIG's focus on post-petition 'inducement' is misplaced in a *trademark use context* . . . In these instances, the general administrative expense claim requirement as stated in *In re Amarex*, 853 F.2d at 1530, of a post-petition transaction and inducement by the debtor is not the relevant inquiry . . . [r]ather, in the *trademark and pre-1984 real property cases*, courts addressing this issue have looked primarily to the debtor's continued post-petition 'use' of that property, and whether such use benefitted the bankruptcy estate.") (emphasis added). In the context of the post-petition use of a trademark, where the law states that the "underlying right to the trademark accrues from the use of a particular name or symbol," the *In re Home Interiors & Gifts* court found that the debtor-in-possession engaged in a transaction with the creditor by knowingly and

---

[15] Remarkably, the appellee does not mention this distinction either.

Case 2:09-cv-01037-JPS Filed 07/29/10 Page 16 of 22 Document 30
Case 08-26131-svk Doc 383 Filed 08/02/10 Page 16 of 22

willingly using the marks in question.[16] *Id.* at *16. Here, the facts of this case are completely divorced from those of the *In re Home Interiors & Gifts* court, as no trademark use is at issue here, and the court finds *Jartran* much more on point. "A benefit to the debtor-in-possession alone, without it having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict [the] policy reason for allowing priority." *In re Old Carco LLC*, 424 B.R. 650, 656 (Bankr. S.D.N.Y. 2010) (citing to *Jartran,* 732 F.2d at 590).

In an attempt to try to further distinguish *Jartran,* the appellant, in its reply brief, argues that in *Jartran*, unlike in this case, the benefit conferred by the creditor was "unquantifiable and unascertainable." (Appellant's Reply Br. 4). The appellant does not cite to any case law for the proposition that the "certainty" of the amount of debt in question is dispositive when determining whether a claim should be afforded administrative status. Rather, this court will rely on the test in *Jartran*, which states that a debt can be an administrative claim if it arose from a transaction with the debtor-in-possession and was beneficial to the debtor-in-possession in the operation of the business. 732 F.2d at 586-87. Here, the appellant has failed to meet its burden of demonstrating that the bankruptcy court erred by finding that no post-petition transaction occurred. Accordingly, this court will affirm the decision of the bankruptcy court in not granting the appellant an administrative claim in the amount of $18,844.75.

---

[16] The court does not voice agreement with the distinction made by the *In re Home Interiors & Gifts* court, but merely restates its holding.

Case 2:09-cv-01037-JPS   Filed 07/29/10   Page 17 of 22   Document 30
Case 08-26131-svk   Doc 383   Filed 08/02/10   Page 17 of 22

Bertram argues, in the alternative, that their "post-petition claim should be given unsecured status." (Appellant's Br. 8). Before the bankruptcy court, the appellant advanced two state-law based theories for why its post-petition claim should be allowed: (1) unjust enrichment; and (2) *quantum meruit*. The bankruptcy court rejected both of the theories presented by the creditor, and Bertram argues on appeal that the bankruptcy court was in error. The court proceeds to evaluate the unjust enrichment claim.

In Wisconsin,[17] an action for unjust enrichment is "based upon proof of three elements: (1) a benefit conferred on the defendant by the plaintiff, (2) appreciation or knowledge by the defendant of the benefit, and (3) acceptance or retention of the benefit by the defendant under circumstances making it inequitable for the defendant to retain the benefit." *Watts v. Watts*, 137 Wis. 2d 506, 531 (1987). The bankruptcy court, in its February 27, 2009 order, found that "the first and second requirements [of an unjust enrichment claim] appear to be met . . . because Bertram provided services to Netwurx's customers, and Netwurx received payment from the customers for those services." (Decision 5). However, the bankruptcy court concluded that Bertram could not recover under an unjust enrichment theory because: (1) Netwurx "unequivocally declined the benefit" for which Bertram now seeks compensation; and

---

[17] The parties do not dispute that Wisconsin law applies to the claim at issue. In federal court, the choice of law is determined by the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). When the parties do not dispute what law should be applied, the court should apply forum law, *Futuresource L.L.C. v. Reuters Ltd.*, 312 F.3d 281 (7th Cir. 2002), and, accordingly, the court will apply Wisconsin law.

(2) "[i]f a person declines in advance a benefit to be conferred by another, then the person conferring the benefit may not recover for unjust enrichment." (Decision 5) (citing to *Lawlis v. Thompson*, 137 Wis. 2d 490, 499 (1987)).

With respect to the unjust enrichment claim, the court does not find error with the bankruptcy court. Bertram does not quibble with the bankruptcy court's conclusions regarding the law, but rather disputes the court's findings regarding the facts of the case, arguing that the "debtor never 'unequivocally declined the benefit' and in fact urged that the benefit continue." (Appellant's Br. 8). Specifically, in arguing that Netwurx did not "decline in advance the benefit conferred" by Bertram, the appellant repeats its earlier concerns that: (1) "the parties were discussing a sale [of Netwurx's customers to Bertram]"; and (2) "Mr. Maher told the Bertrams that they could not shut off service due to the bankruptcy." (Appellant's Br. 8). For the reasons discussed above, the court cannot find clear error with the bankruptcy court's factual findings. The bankruptcy court relied upon the testimony of Mr. Maher and Mr. Roller to conclude that the appellee's chief executive officer told Bertram that Netwurx no longer desired the appellant's services. The mere fact the bankruptcy court found the testimony of Mr. Maher and Mr. Roller to be more credible than the testimony of the Bertrams does not mean that the bankruptcy court's findings were clearly erroneous. *In re Pearson Bros. Co.*, 787 F.2d 1157, 1162 (7th Cir. 1986) ("[T]he bankruptcy judge's determination . . . was based upon the conflicting testimony of two witnesses and must be upheld if the testimony

accepted by the trier of fact was coherent, facially plausible and uncontradicted by documentary or objective evidence."). Here, the appellant only complains that the bankruptcy court did not accept the Bertrams' version of the facts, an insufficient ground to reverse a bankruptcy court's factual findings.[18] *Id.* Moreover, even if the court fully accepts the testimony that: (1) there were discussions about Bertram purchasing Netwurx's customers; and (2) Mr. Maher stated "I don't believe you can shut my customers off because its an estate," such evidence does not call into dispute whether Netwurx *declined* the benefit conferred by Bertram: Netwurx was clear that they were no longer going to pay Bertram. Testimony with respect to tangential questions about obtaining the appellee's clients and Mr. Maher's lukewarm assertions about bankruptcy law does not warrant reversal of the bankruptcy court's ultimate conclusion.

Bertram also asserts that the bankruptcy court erred with respect to its claim based on *quantum meruit*. Recovery in *quantum meruit* is "allowed for services performed for another on the basis of a contract implied in law or an implied promise to pay the performer for what the services were reasonably worth." *In re Estate of Voss*, 20 Wis. 2d 238, 241 (1963). *Quantum meruit* is applicable where: (1) the defendant requested the plaintiff to perform services; (2) the plaintiff complied with

---

[18] Bertram contends that Netwurx was attempting to mislead and lure the appellant into continuing its services. The question of the intent of the parties is largely one related to the credibility of the conflicting witnesses. The court will defer to the trier of fact on such questions. *Pearson Bros. Co.,* 787 F.2d at 1162 ("The question of credibility of witnesses is peculiarly for the trier of fact and an appellate court will not redetermine the credibility of witnesses where the trial court had the opportunity to observe their demeanor and form a conclusion.").

-20-

the request; and (3) the services were valuable to the defendant.[19]  *W.H. Fuller Co. v. Seater*, 226 Wis. 2d 381, 386 n.2., 595 N.W.2d 96 (Ct. App. 1999).  The bankruptcy court concluded that "Bertram's *quantum meruit* argument fails because Netwurx made no promise to pay, and therefore Bertram could not expect reasonable compensation."  (Decision 5).

Again, Bertram on appeal does not dispute the bankruptcy court's interpretation of the law, but instead argues that contrary evidence existed that conflicted with the evidence relied on by the court.  (Appellant's Br. 9) ("Again the Bankruptcy Court relies on Peter Maher's testimony . . . [h]owever, this is entirely contradictory of Mr. Maher's statements a few days later stating that the Bertrams had to keep providing him service.").  For the reasons stated above, the bankruptcy court was not clearly erroneous by finding the testimony of Mr. Maher and Mr. Roller to be more persuasive than that of the Bertrams.  Moreover, Mr. Maher's statement that he "didn't believe" Bertram was allowed to shut off Netwurx's customers is a ways removed from a "request" for Bertram to continue services, especially when

---

[19] Indicative of the quality of the brief, the appellant's attorney opted to not cite any authority for what the elements of a *quantum merit* claim are.  (Appellant's Br. 9) ("To satisfy the elements of quantum merit, there must be three elements.  The defendant must request a service; the service must be performed; and the plaintiff must expect reasonable compensation.   Again, the Bankruptcy Court relies . . .").

Case 2:09-cv-01037-JPS   Filed 07/29/10   Page 21 of 22   Document 30
Case 08-26131-svk   Doc 383   Filed 08/02/10   Page 21 of 22

viewed in light of Netwurx's earlier statements about its unwillingness to pay the appellant.[20]

In the final analysis, the bulk of Bertram's argument rests on a very thin reed – the suggestion that an assertion made by Mr. Maher, a layperson and non-lawyer, concerning the implications of bankruptcy law compelled the appellant to continue to provide telecommunications services to the debtor. To be sure, the suggestion that anyone seasoned with many years of experience in operating a business would be persuaded by the legal musings of a non-lawyer to continue providing thousands of dollars in services strains all credulity. Thus, the court is obliged to affirm the decision of the bankruptcy court and dismiss this appeal in its entirety.

Accordingly,

**IT IS ORDERED** that this appeal be and the same is hereby **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 29th day of July, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[20] The appellant states that "[t]here is no reason not to believe that one would be compensated for a service compelled in such a way." (Appellant's Br. 10). The court has difficulty with even understanding the appellant's argument, as it contains a double negative. *See* GERALDINE WOODS, ENGLISH GRAMMAR FOR DUMMIES 306 (2d ed. 2010) ("If you think this is one in a long list of useless grammar rules, think again. A double-negative mistake can completely wreck your sentence.") Beyond the grammatical error, the court finds it preposterous that Bertram "believed" that it *would be compensated* when Mr. Maher stated that he "didn't believe" that the appellant could shut off service; nothing in Mr. Maher's comments indicate that Netwurx would pay Bertram for services rendered.